**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____

|  |  |  |
|---|---|---|
| **CB AVIATION, LLC,** | : | **CIVIL ACTION** |
|  | : |  |
| **Plaintiff,** | : |  |
|  | : |  |
| **v.** | : | **NO.  2:10-cv-1411-JD** |
|  | : |  |
| **HAWKER BEECHCRAFT CORP.,** | : |  |
|  | : |  |
| **Defendant.** | : |  |

_____

**DuBois, J.**                                                                    **November 8, 2011**

**M E M O R A N D U M**

## I.      INTRODUCTION

This case arises out of the sale of an airplane by defendant to plaintiff pursuant to a sale agreement executed in October 2007. In September 2009, plaintiff discovered that the airplane had a structural defect and filed suit claiming breach of contract, breach of express and implied warranties, and rescission based on mutual mistake of fact. Defendant has raised three defenses: (1) a release agreement the parties signed before they discovered the defect at issue; (2) failure of plaintiff to afford defendant its right to cure the defect; and (3) rescission and revocation of acceptance are not appropriate because a third party has foreclosed upon the aircraft.

Presently before the Court are plaintiff's Motion for Partial Summary Judgment and defendant's Second Motion for Summary Judgment. For the reasons set forth below, both defendant's motion and plaintiff's motion are granted in part and denied in part. Specifically, the Court grants defendant's motion with regard to plaintiff's rescission claim and denies defendant's motion in all other respects. The Court grants plaintiff's motion with respect to plaintiff's breach of contract and breach of express warranty claims and denies plaintiff's motion

as to plaintiff's rescission and breach of implied warranty claims. A jury trial is required to determine whether plaintiff properly revoked its acceptance of the airplane and the amount of plaintiff's damages.

## II.    BACKGROUND

### A.    The Resale Aircraft Purchase Agreement

In October 2007, plaintiff and defendant entered into the Resale Aircraft Purchase Agreement (the "Agreement" or "Sale Agreement") by which defendant sold plaintiff a Raytheon Aircraft Company Model Beech 390 (Premier I) aircraft (the "Aircraft"). (Resale Aircraft Purchase Agreement, CB Aviation, LLC's Resp. Opp'n Hawker Beechcraft Corp.'s Second Mot. Summ. J. ("Pl.'s Resp."), Ex. A.) Defendant manufactured the Aircraft. (Hawker Beechcraft Corp.'s Resps. CB Aviation, LLC's First Set Requests Admis., CB Aviation, LLC's Mot. Partial Summ. J. ("Pl.'s Mot."), Ex. D.) The sale price of the Aircraft was $4,194,250, payable upon delivery. (Resale Aircraft Purchase Agreement, Pl.'s Resp., Ex. A.)

Section II, paragraph 1 of the Agreement states that "at the time of [plaintiff's] acceptance of the Aircraft . . . , the Aircraft will be in an airworthy condition with all systems, installed equipment and engines functioning normally; [and] with all applicable published airworthiness directives and mandatory services bulletins completed." (Id.) Section IV, paragraph 7 of the Agreement states that the Aircraft is a used aircraft and that plaintiff "AGREES THAT, EXCEPT FOR THE SELLER'S REPRESENTATIONS IN SECTION II, PARAGRAPH 1 . . . , THE AIRCRAFT IS PURCHASED 'AS IS, WHERE IS, AND WITH ALL FAULTS.' [PLAINTIFF] ACKNOWLEDGES THAT, IN PURCHASING AND

ACCEPTING THE AIRCRAFT, [PLAINTIFF] HAS RELIED SOLELY UPON ITS OWN

INVESTIGATION OF THE AIRCRAFT." (Id.)

Before defendant delivered the Aircraft, the purchase price was paid in full. (Decl. of

Carl E. Chetty ("Chetty Decl."), Pl.'s Resp., Ex. B ¶ 4.) Defendant delivered, and plaintiff

accepted, the Aircraft on February 22, 2008. (Certificate of Final Acceptance and Delivery, Def.

Hawker Beechcraft Corp.'s Second Mot. Summ. J. ("Def.'s Mot."), Ex. B.)

  **B.**  **The Release Agreement**

On March 2, 2008, Carl Chetty, the CEO of CB Aviation, flew the Aircraft for the first

time as pilot-in-command. (Chetty Decl. ¶ 7.) During the flight, the exterior baggage door

"departed from the Aircraft, causing damage to the Aircraft fuselage, tail, and engine nacelle."

(Id. ¶ 7.) Plaintiff threatened to sue, and in response defendant offered to repair the Aircraft and

give plaintiff an $80,000 credit toward defendant's maintenance program. (Id. ¶¶ 9–12;

Settlement Agreement and Release, Pl.'s Resp., Ex. F ¶ 1.) In exchange, the parties executed a

Settlement Agreement and Release (the "Release" or "Release Agreement") on April 3, 2008.

(Settlement Agreement and Release, Pl.'s Resp., Ex. F.)

Two recitals appear at the beginning of the Release: "[1] WHEREAS, the baggage door

departed [the Aircraft] on or about March 2, 2008, and the [A]ircraft needs to be repaired; [and

2] WHEREAS, the parties desire to resolve any claims associated with the baggage door

departure upon mutually acceptable terms." (Id.) The Release contains eight paragraphs of

specific provisions. The first paragraph states that defendant would repair "the damage caused by

the door separation," at its own cost, and that defendant would "credit $80,000 towards CB

Aviation's Support Plus program." (Id.) The second, third, and seventh paragraphs deal with the specifics of the repairs. (Id.) In the fourth, plaintiff agreed to "release and fully discharge [defendant] . . . from any and all claims, demands and causes of action they have or claim to have against [defendant] arising out of or relating to the baggage door separation incident or the purchase of the [A]ircraft." (Id.) The fifth states that the Release is not an admission of liability on the part of defendant, and the sixth calls for the parties to keep the terms of the Release confidential. (Id.) The eighth paragraph is an integration clause. (Id.)

### C.     The Cuts in the Center Pillar

On September 2, 2009, defendant discovered cuts in the center pillar of the Aircraft's windshield during a routine 1800-hour inspection at defendant's service facility. (Timothy Gray Aff. ("Gray Aff."), Def.'s Reply Pl.'s Resp. Opp'n Def.'s Mot. Summ. J. ("Def.'s Reply"), Ex. J ¶ 5.) Neither plaintiff nor defendant knew of the existence of the cuts prior to the 1800-hour inspection. (Def.'s Resps. Pl.'s First Set Requests Admis., Pl.'s Mot., Ex. D ¶ 15; Pl. CB Aviation LLC's Statement of Uncontroverted Facts Supp. its Partial Mot. Summ. J. ¶ 17.) The cuts were discovered when the windshield was removed; they could not be seen with the windshield in place. (Def.'s Resps. Pl.'s First Set Requests Admis., Pl.'s Mot., Ex. D ¶ 12.) As a result of the cuts, the Aircraft did not conform to its FAA type certificate and thus was not airworthy. (Id. ¶ 19; Dep. Thomas Graham Christy ("Christy Dep."), Pl.'s Mot., Ex. F, at 139, 143.)

At the time of the 1800-hour inspection, plaintiff was leasing the Aircraft to Freedom Jet Express, LLC ("Freedom Jets"). (Pl. CB Aviation LLC's Statement Uncontroverted Facts Supp.

Its Partial Mot. Summ. J. ¶ 25.) When defendant discovered the cuts, it immediately notified a

representative of Freedom Jets. (Gray Aff. ¶ 6.) Defendant thereafter repaired the cuts and

informed Freedom Jets that the repairs were complete and that the Aircraft was ready to be

picked up. (Dep. Brian Sutch ("Sutch Dep."), Def.'s Mot., Ex. E, at 102; Christy Dep. 152–53.)

Upon learning of the cuts, Mr. Chetty decided that he lacked confidence in the Aircraft's

safety. (Dep. of Pietro Cuomo ("Cuomo Dep."), Def.'s Reply, Ex. L 75–76.) On September 25,

2009, Mr. Chetty sent an email to defendant asking defendant to call him and stating, "I have

decided I do not want this [A]ircraft back. I am very disturbed with the defects this [A]ircraft has

and I cannot put my family in it." (Email from Carl Chetty to Don Mercer, Sept. 25, 2009, Pl.'s

Mot., Ex. G.) On November 25, 2009, counsel for Mr. Chetty sent defendant a letter explicitly

"demand[ing] rescission of the transaction and that [defendant] immediately repurchase the

Aircraft from [plaintiff] and that the parties be returned to their respective positions <u>ab initio</u>."

(Letter from Mark B. Goldstein, Esq., to Pamela E. Bailey, Esq., Nov. 25, 2009, Pl.'s Mot., Ex.

H.) Neither plaintiff nor Freedom Jets ever retook possession of the Aircraft after the 1800-hour

inspection.

### D. Webster's Repossession of the Aircraft

Webster Capital Finance, Inc.[1] ("Webster") financed $3,714,825 of the purchase price of

the Aircraft secured by a lien on the Aircraft. Loan Schedule No. 1, Compl. Exs. D, H, <u>Webster</u>

<u>Capital Fin., Inc. v. Chetty Builders, Inc.</u>, Nos. 10-5207, 10-5208, 10-5209, 2011 WL 2039058

---

[1] Webster Capital Finance, Inc., was formerly known as Center Capital Corporation.

(E.D. Pa. May 20, 2011) (DuBois, J.).[2] Plaintiff began making monthly payments pursuant to the loan agreement ("Loan Agreement") in April 2008. Webster, 2011 WL 2039058, at *2. When plaintiff learned of the cuts in the center pillar, it entered into an Amendment and Restatement of Loan/Lease Agreement (the "Amended Loan Agreement") with Webster. Id. The Amended Loan Agreement called for the repayment of $3,497,438.26 in forty-seven monthly installments, which plaintiff began making on August 1, 2009. Id. Plaintiff paid a total of $756,383.14 to Webster between April 2, 2008, and March 4, 2010. Def.'s Mot. Open Confessed J., Ex. A, Webster, 2011 WL 2039058.

Plaintiff stopped making payments to Webster after March 4, 2010. Id. at *3. Webster thereafter notified plaintiff that Webster was accelerating the debt and demanding payment of the entire balance of the loan, as was authorized by the Loan Agreement. Id. Webster filed a Complaint in Confession of Judgment for Money in this Court on October 5, 2010, and the Clerk of the Court entered judgment against plaintiff on the same day in the amount of $4,259,299.72 plus interest. Id. at *4. The amount of the judgment was disputed by plaintiff; plaintiff and Webster disagreed over whether plaintiff made payments before March 4, 2010, under the Loan Agreement or, rather, under a different financing agreement involving a helicopter unrelated to the instant case. Id. at *3. That dispute was resolved on May 25, 2011, by agreement; Webster and plaintiff agreed to reduce the judgment to $3,600,000, and the Court issued an Order to that effect on that date. Order, May 25, 2011, Webster, 2011 WL 2039058. The agreement and the

---

[2] The Court's May, 20, 2011, opinion in Webster, 2011 WL 2039058, states the relevant facts of the financing agreement between Webster and plaintiff in full.

Order also required plaintiff to turn over to Webster the Aircraft, all log books, and all maintenance records. Id. Webster currently has possession of the Aircraft.

## III.    LEGAL STANDARD

In considering a motion for summary judgment, "the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." Wishkin v. Potter, 476 F.3d 180, 184 (3d Cir. 2007). The party opposing the motion, however, cannot "rely merely upon bare assertions, conclusory allegations or suspicions" to support its claim. Fireman's Ins. Co. v. DuFresne, 676 F.2d 965, 969 (3d Cir. 1982). After examining the evidence of record, a court should grant summary judgment if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); accord Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986).

A factual dispute is material when it "might affect the outcome of the suit under the governing law," and genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citation omitted).

IV.    **DISCUSSION**

A.    **The Release Agreement**

Defendant argues as a threshold matter that the Release Agreement precludes plaintiff

from bringing any action against defendant relating to the Aircraft. Defendant relies upon a

single phrase in the Release stating that plaintiff released and discharged defendant from any

claims based upon "the baggage door separation incident <u>or the purchase of the Aircraft</u>."

(Settlement Agreement and Release, Pl.'s Resp., Ex. F (emphasis added).) Defendant claims that

this discharge "covers claims relating back to the purchase of the Aircraft and specifically

releases revocation, rescission, and rejection attempts." (Def.'s Reply 6.) The Court rejects

defendant's argument and concludes that the Release covers only claims related to the baggage

door separation incident.

This Court ruled in a previous opinion that Pennsylvania law governs the Release. <u>C.B.</u>

<u>Aviation, LLC v. Hawker Beechcraft Corp.</u>, No. 10-1411, 2010 WL 3221899, at *4 (E.D. Pa.

Aug. 12, 2010) (DuBois, J.). When interpreting the language of a contract under Pennsylvania

law, the court must first determine whether, as a matter of law, the language is ambiguous. <u>See</u>

<u>In re Nelson Co.</u>, 959 F.2d 1260, 1263 (3d Cir. 1992); <u>St. Paul Fire & Marine Ins. Co. v. Lewis</u>,

935 F.2d 1428, 1431 (3d Cir. 1991) ("Determining whether the terms of a contract are

ambiguous is a question of law."). If the contract is ambiguous, the fact finder must interpret it; if

the language of the contract is clear, the court interprets the agreement. <u>Nelson</u>, 959 F.2d at

1263; <u>STV Eng'rs, Inc. v. Greiner Eng'g, Inc.</u>, 861 F.2d 784, 787 (3d Cir. 1988). A court will

find that a contract is not ambiguous if it "can determine its meaning without any guide other

than a knowledge of the simple facts on which, from the nature of the language in general, its meaning depends; and <u>a contract is not rendered ambiguous by the mere fact that the parties do not agree upon the proper construction</u>." <u>Dept. of Transp. v. Brozzetti</u>, 684 A.2d 658, 663 (Pa. Commw. Ct. 1996). With an unambiguous contract, the court may not consider extrinsic evidence; only the fact finder may do so upon a court's determination that the agreement is ambiguous. <u>Id.</u>

In Pennsylvania, courts construe releases narrowly. <u>Wenger v. Ziegler</u>, 226 A.2d 653, 654 (Pa. 1967). "In doing so, the document is not interpreted with such rigidity to create a contract contrary to the intention of the parties." <u>Hower v. Whitmak Assocs.</u>, 538 A.2d 523, 527 (Pa. Super. Ct. 1988). "It is established law that a release normally encompasses only such matters which may fairly be said to have been within the contemplation of the parties when the release was given." <u>Id.</u> Accordingly, "a waiver is to be construed strictly so as not 'to bar a claim which has not accrued at the date of the execution of the release.'" <u>Henry Shenk Co. v. City of Erie</u>, 43 A.2d 99, 102 (Pa. 1945) (quoting <u>In re Brill's Estate</u>, 12 A.2d 50, 52 (PA 1940)); <u>accord Fortney v. Callenberger</u>, 801 A.2d 594, 597 (Pa. Super. Ct. 2002); <u>Vaughn v. Didizian</u>, 648 A.2d 38, 40–41 (Pa. Super. 1994); <u>Restifo v. Mc.Donald</u>, 230 A.2d 199, 201 (Pa. 1967)).

Construing the Release in the instant case strictly, the Court concludes that it is not ambiguous and does not bar plaintiff's claims. The Release specifically references only claims arising out of the baggage door separation incident. Because plaintiff's claims in this case are based on the cuts in the center pillar, rather than the baggage door incident, the Release does not apply.

Defendant urges the Court to read this language as a release of two separate categories of claims: (1) claims arising out of the baggage door separation incident and (2) claims related to the purchase of the aircraft. Defendant argues that the latter would preclude any action for breach of warranty, rescission, or revocation of acceptance on any grounds at all. Any other interpretation, defendant argues, would render the "or the purchase of the aircraft" language redundant. Defendant also argues that its crediting $80,000 toward the maintenance program in plaintiff's favor constituted consideration for a release from all claims relating to the purchase of the Aircraft. The Court rejects these arguments.

First, under the narrow reading that Pennsylvania law requires, Wenger, 226 A.2d at 654, neither the language defendant cites nor the amount of consideration is sufficient to convince the Court that claims based on a yet-undiscovered defect unrelated to the baggage door incident were "within the contemplation of the parties when the release was given," Hower, 538 A.2d at 527. Pennsylvania courts have generally held that causes of action that have not accrued at the time a release is signed are not within the contemplation of the parties. See, e.g., Vaughn, 648 A.2d at 40–41; cf. Fortney, 801 A.2d at 597.

In Vaughn, for example, the victim in an automobile accident signed a release discharging the person who caused the accident, "and all other persons, firms and corporations from all claims and demands, rights and causes of action of any kind the undersigned now has or hereafter may have on account of or in any way growing out of personal injuries known or unknown to [the plaintiff] at the present time . . . resulting or to result from [the accident]." 648 A.2d at 38 (emphasis added). The court determined that this release did not preclude plaintiff

from bringing a medical malpractice claim against a doctor who treated plaintiff for the injuries he sustained in the automobile accident. Specifically, the court held that "it would be . . . absurd in this case to conclude that the parties intended to waive damages resulting from [defendant's] alleged negligence when the release was executed approximately seven months before [plaintiff] first sought treatment from [defendant]." Id. at 40–41. The Vaughn court so ruled despite the fact that plaintiff's injuries stemmed from the incident giving rise to the release and appeared to be explicitly covered by the release. In the instant case, plaintiff's claims are unrelated to the incident giving rise to the Release.

It is correct that, unlike this case, the defendant doctor in Vaughn was not a party to the release. However, the court in Vaughn did not rely on this fact, but instead relied on the more general rule that releases do not bar unaccrued claims. Id. Further, other courts in Pennsylvania have refused to read releases as barring unaccrued claims even when the parties to the release were the same as the parties in the subsequent litigation. See,e.g., Barnes v. Ream, No. 88-SU-00545-01, 1988 WL 168480, at *2 (Ct. Com. Pl. York Cnty.  Dec. 5, 1988) (holding that release discharging "claims . . . on account of all injuries, known and unknown, both to person and property" did not bar personal injuries diagnosed at a later date because plaintiff could not have known of the existence of those injuries).

Under a plain reading of the Release, the court concludes that the "arising out of or relating to the baggage door separation incident" language covers only claims for damages resulting from that incident. Likewise, the court concludes that the "or the purchase of the aircraft" language precludes claims of revocation or rescission resulting only from that incident.

Thus, the Release covers only claims arising from the baggage door separation and does not render any portion of the Release redundant.[3]

**B.      Breach of Express Warranty[4]**

This Court ruled in an earlier opinion, by agreement of the parties, that Kansas law governs the Sale Agreement. C.B. Aviation, LLC v. Hawker Beechcraft Corp., No. 10-1411, 2010 WL 3221899, at *2 (E.D. Pa. Aug. 12, 2010) (DuBois, J.). Because the Agreement is for the sale of goods, it is governed by Article 2 of the Uniform Commercial Code ("UCC"), codified in Kansas at Kan. Stat. Ann. § 84-2-101 et seq.

Plaintiff claims that defendant breached the express warranty of airworthiness contained in the Sale Agreement. Under the UCC as adopted in Kansas, "[a] buyer claiming breach of an express warranty related to performance must prove [1] the existence of the express warranty and [2] the breach thereof." Cricket Alley Corp. v. Data Terminal Sys., Inc., 732 P.2d 719, 720 (Kan. 1987).

The first element—the existence of the express warranty—is satisfied in this case. Under Kansas law, a seller creates an express warranty by, inter alia, making an "affirmation of fact or

---

[3] Plaintiff urges the Court to consider emails preceding the signing of the Release between defendant and plaintiff as well as the fact that defendant repaired the cuts in the center pillar without prompting from plaintiff. (Pl.'s Resp. 10, 13.) However, because the Release is not ambiguous as a matter of law, St. Paul Fire, 935 F.2d at 1431, the Court may not consider such evidence. Brozzetti, 684 A.2d at 663.

[4] Plaintiff alleges both breach of express warranty and breach of contract. Plaintiff's breach of contract claim is coterminous with the breach of express warranty claim because both claims assert that the Aircraft was not airworthy. Thus, this opinion will treat both claims as the same and refer to them as plaintiff's breach of express warranty claim.

promise" relating to the goods. K.S.A. § 84-2-313(1). The seller need not use formal language such as "warrant" or "guarantee." Id. § 84-2-313(2). Section II, paragraph 1 of the Agreement states that "at the time of [plaintiff's] acceptance of the Aircraft . . . , the Aircraft will be in an airworthy condition." (Resale Aircraft Purchase Agreement, Pl.'s Resp., Ex. A.) The language in Section IV disclaiming all warranties specifically exempts the warranties in Section II, leaving the airworthiness warranty intact. (Id.) The Agreement contains an "affirmation of fact or promise" relating to the goods—i.e., a promise that the Aircraft would be airworthy—and thus, under K.S.A. § 84-2-313(1)(a), the Agreement contains an express warranty.

The second element of breach of express warranty—the breach itself—is also satisfied in this case. Under Kansas law, a good is nonconforming if it is not in "accordance with the obligations under the contract." K.S.A. § 84-2-106. As defendant has admitted, the cuts in the center pillar of the windshield rendered the Aircraft "not airworthy." (Def. Hawker Beechcraft Corp.'s Resp. Pl.'s Statement Uncontroverted Facts ¶ 19.) Defendant has also admitted that the cuts existed when plaintiff took possession of the Aircraft. (Id. ¶ 16.) Thus, when defendant delivered to plaintiff an aircaft that was "not airworthy," defendant was in breach of the Agreement.

The parties contest the proper remedy for the breach. A buyer who has accepted goods when the seller breached a warranty has two options: (1) revoke acceptance under K.S.A. § 84-2-608 or (2) keep the goods and sue for damages under K.S.A. § 84-2-714. There is no dispute that plaintiff accepted the goods; plaintiff took delivery of the Aircraft and flew it for two years before defendant notified it of the defect.

Plaintiff claims that it properly revoked acceptance under K.S.A. § 84-2-608. If a jury finds that plaintiff has satisfied the elements for revocation of acceptance, K.S.A. § 84-2-711 provides the proper remedy. This is discussed in section IV.C, <u>infra</u>. However, if a jury finds that plaintiff did not properly revoke, its acceptance was final and plaintiff's remedy is found in K.S.A. § 84-2-714(2), which provides the proper measure of damages for breach of warranty when the buyer accepts the goods. In either case, a jury trial is required to calculate damages.

### C.      Breach of Implied Warranty

Plaintiff also claims breach of the implied warranty of merchantability under K.S.A. § 84-2-314. Under K.S.A. § 84-2-314, if the "seller is a merchant with respect to the goods of that kind," an implied warranty exists that the goods are "merchantable." To be "merchantable," the goods must be, inter alia, "fit for the ordinary purpose for which such goods are used." <u>Id.</u> § 84-2-314(2)(c). Plaintiff claims that defendant breached the implied warranty of merchantability because the Aircraft was not airworthy and "an ordinary pilot/buyer would not reasonably accept a non-airworthy aircraft containing structural defects and/or a resulting damage history without objection, particularly where the buyer had paid for and agreed to accept an airworthy aircraft." (Pl. CB Aviation, LLC's Mem. Law Supp. Its Mot. Partial Summ. J., 17–18.)

Plaintiff's claim, however, is barred by the language in Section IV Paragraph 7 of the Sale Agreement, which states that, except for the airworthiness guarantee, THE AIRCRAFT IS PURCHASED 'AS-IS, WHERE IS, AND WITH ALL FAULTS.'" (Sale Agreement, Pl.'s Resp., Ex. A.) Section 84-2-316(3)(a) of the Kansas Statute states "all implied warranties are

excluded by expressions like 'as is,' 'with all faults' or other language which in common understanding calls the buyer's attention to the exclusion of warranties and makes plain that there is not implied warranty." The disclaimer in Section IV Paragraph 7 of the Sale Agreement uses the precise words called for in K.S.A. § 84-2-316(3)(a), and thus disclaims any implied warranty of merchantability. By its terms, Section IV Paragraph 7 exempts from its reach the express warranty of airworthiness in Section II. Thus, plaintiff's only viable breach of warranty claim is the breach of express warranty discussed above.

### D.   Revocation of Acceptance

#### 1.   A Jury Trial Is Required to Determine Whether Plaintiff Properly Revoked Acceptance

Plaintiff claims that it properly revoked acceptance under K.S.A. § 84-2-608, which states:

> (1) The buyer may revoke his acceptance of a lot or commercial unit whose nonconformity substantially impairs its value to him if he has accepted it
> > (a) on the reasonable assumption that its nonconformity would be cured and it has not been seasonably cured; or
> > (b) without discovery of such nonconformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.
> (2) Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it.
> (3) A buyer who so revokes has the same rights and duties with regard to the goods involved as if he had rejected them.

Thus, plaintiff must prove four elements to establish that it properly revoked acceptance: (1) the

goods suffered from a nonconformity that substantially impaired their value; (2) the buyer

accepted the goods without notice of the nonconformity; (3) the buyer made revocation within a

reasonable time after discovering the defect and before any substantial change in the condition of

the goods; and (4) the buyer notified the seller promptly. See Scotwood Indus., Inc. v. Frank

Miller & Sons, Inc., 435 F. Supp. 2d 1160, 1167–68 (D. Kan. 2006) (enumerating elements with

slightly different emphasis); Hemmert Agric. Aviation, Inc. v. Mid-Continent Aircraft Corp., 663

F. Supp. 1546, 1551 (D. Kan. 1987) (same).

Because there are genuine issues of material fact as to the first and third elements, a jury

trial is required to determine whether plaintiff properly revoked.

### a.        Nonconformity and Substantial Impairment

There is no genuine issue of material fact as to whether the goods were nonconforming

because the parties agree that the Aircraft was not airworthy. However, there is a genuine issue

of material fact as to whether the cracks in the center pillar substantially impaired the value of

the Aircraft. Plaintiff recognized this issue, stating in its brief that a jury trial is required on the

issue of substantial impairment. (Pl. CB Aviation, LLC's Mem. L. Supp. Its Mot. Partial Summ.

J. 3.)

Under Kansas law, the finder of fact determines whether there is substantial impairment

for the purposes of K.S.A. § 84-2-608. See Scotwood, 435 F.Supp.2d at 1168

("[N]onconformity, the needs and circumstances of the purchaser and substantial impairment of

value to a purchaser are all issues to be determined by a trier of fact." (quoting Newmaster v. Se.

Equipment, Inc., 646 P.2d 488, 489 (Kan. 1982)); Hemmert, 663 F. Supp. at 1551–52. Defendant

has demanded a jury trial in this case. Thus, a jury trial is required to determine whether there was substantial impairment.

### b.    Plaintiff's Lack of Notice of the Nonconformity

Under K.S.A. § 84-2-608(1)(a) & (b), the buyer must have accepted the goods either "(a) on the reasonable assumption that [the] nonconformity would be cured and it has not been seasonably cured; or (b) without discovery of such nonconformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances." In this case, plaintiff accepted the goods without knowledge of the nonconformity. Neither plaintiff nor defendant knew about the cuts on the center pillar, and it was impossible to discover the cuts without removing the windshield. Therefore, K.S.A. § 84-2-608(1)(b) is satisfied and there is no genuine issue of material fact as to whether plaintiff has met its burden of establishing that it accepted delivery of the Aircraft without notice of the defect.

### c.    Timeliness of Plaintiff's Revocation

K.S.A. § 84-2-608(2) requires that the buyer revoke acceptance "within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods." Whether the buyer revokes within a reasonable time depends on the circumstances and the type of goods involved. See Chernick v. Casares, 759 S.W.2d 832 (Ky. Ct. App. 1988) (finding, under identical UCC provision, that "the type of goods involved may be dispositive of what constitutes a reasonable time in which to revoke acceptance; perishable or seasonal goods demand prompter action than, for instance, a long-term fixture").

The jury is responsible for determining whether revocation takes place "within a

reasonable time after the buyer discovers" the nonconformity. <u>See</u> <u>Lehigh, Inc. v. Stevens</u>, 468

P.2d 177, 182 (Kan. 1970). Thus, the jury must determine whether Chetty sent his email "within

a reasonable time" after plaintiff learned of the cracks in the center pillar. K.S.A. § 84-2-608(2).

### d.    Notice

Finally, to properly revoke acceptance, a buyer must notify the seller that it is doing so.

The buyer need not use any particular language. <u>See</u> <u>Moulden & Sons, Inc. v. Osaka</u>

<u>Landscaping & Nursery, Inc.</u>, 584 P.2d 968, 971 (Wash. Ct. App. 1978) (holding, under identical

UCC provision, that "[t]he Code only requires that a buyer, in revoking an acceptance, give

notice of the breach to the seller which notice states that the buyer is not accepting the goods");

Williston on Contracts 40:31 (2011) (citing <u>Moulden</u>). Rather, the buyer need only indicate that

it does not want the goods anymore and communicate that desire to the seller. <u>Id.</u>

Chetty's email of September 25, 2009, states, "I have decided I do not want this

[A]ircraft back. I am very disturbed with the defects this [A]ircraft has and I cannot put my

family in it." (Email from Carl Chetty to Don Mercer, Sept. 25, 2009, Pl.'s Mot., Ex. G.) This is

sufficient notice under K.S.A. § 84-2-608(2) because Chetty clearly stated he did not want the

aircraft back.

### 2.    There Is No Right to Cure Under Kansas Law in This Situation

Defendant argues that it properly cured the defect by repairing the Aircraft upon

discovering the cuts in the center pillar. Thus, defendant takes the position that plaintiff did not

have a right to revoke acceptance of the Aircraft. Plaintiff responds that a right to cure only

exists if the buyer properly rejected the goods upon delivery under K.S.A. § 84-2-601, not when

the buyer revokes acceptance under K.S.A. § 84-2-608. While the law in Kansas is not entirely

clear on this point, the Court concludes that plaintiff is correct that there is no right to cure where

a seller properly revokes acceptance.

K.S.A. § 84-2-508 states:

> (1) Where any tender or delivery by the seller is rejected because
> nonconforming and the time for performance has not yet expired,
> the seller may seasonably notify the buyer of his intention to cure
> and may then within the contract time make a conforming delivery.
> (2) Where the buyer rejects a nonconforming tender which the
> seller had reasonable grounds to believe would be acceptable with
> or without money allowance the seller may if he seasonably
> notifies the buyer have a further reasonable time to substitute a
> conforming tender.

On its face, K.S.A. § 84-2-508 applies only where the buyer rejected the goods, not

where the buyer revoked a prior acceptance. Plaintiff cites two cases for the proposition that

K.S.A. § 84-2-508 does not apply to revocation of acceptance. In Linscott v. Smith, 587 P.2d

1271 (Kan. Ct. App. 1978), the plaintiffs bought a mobile home from the defendant. The mobile

home was not properly insulated and had numerous leaks. Id. at 1272–73. After delivery, the

manufacturer sent a worker to reinsulate the mobile home with fiberglass insulation, but

plaintiffs refused to allow him to fix the home because they wanted foam core insulation. Id. at

1273. Plaintiffs sued for breach of warranty. Id. The trial court ruled in defendant's favor on the

ground that plaintiffs refused to allow the defendant to cure the defect. The Kansas Court of

Appeals disagreed, holding that "[t]he right to cure or substitute for non-conforming goods arises

only upon the buyer's rejection of the goods." Id. However, Linscott was not a revocation-of-

acceptance case. Rather than revoking their acceptance, the plaintiffs in Linscott accepted the

19

mobile home and sued for damages. See id. at 1274 ("Even if it were said that plaintiffs initially rejected the mobile home, their continued use of it converted their rejection into an acceptance.").

Defendant in this case argues that Linscott is not controlling because it is not a revocation of acceptance case, but rather an acceptance of delivery case. According to defendant, when the Kansas Court of Appeals held that the right to cure "arises only upon the buyer's rejection of the goods," id. at 1273, what it really meant was that the right to cure does not arise where the buyer accepts the goods and sues for damages, but only where the buyer attempts to return the goods, either by rejecting delivery or revoking acceptance. On the other hand, plaintiff urges the Court to apply the holding in Linscott literally and conclude that a seller only has a right to cure "upon the buyer's rejection [of delivery] of the goods." Id. (emphasis added).

Plaintiffs also cite Fleet Maintenance, Inc. v. Burke Energy Midwest Corp., 728 P.2d 408 (Kan. Ct. App. 1986) as following Linscott and holding that there is no right to cure in a revocation-of-acceptance case. In Fleet, Burke bought a truck engine from Fleet that did not work properly. However, instead of asking Fleet to repair the engine or replace it with a new one, Burke simply refused to pay for the engine. Fleet sued Burke for the purchase price. The trial court entered judgment for Fleet, stating that "[a]s a matter of law, [Burke] should have given [Fleet] an opportunity to correct any fault with the engine and [Fleet] was not given that opportunity." Id. at 410. The Kansas Court of Appeals disagreed, citing the above quoted language in Linscott. However, there was no revocation of acceptance in Fleet because Burke never gave Fleet notice of revocation. See id. at 410 ("Here, Burke indicated its willingness to

accept the engine as delivered by never notifying Fleet that it was rejecting and then

appropriating the engine for its own use. Therefore, Fleet had no right to cure."). Thus, the <u>Fleet</u>

court held that "Burke may be barred not by its failure to allow Fleet to cure, but rather, by its

failure to notify Fleet of breach after acceptance." <u>Id.</u>

One can interpret the language in <u>Fleet</u> two ways: Plaintiff in the instant case argues that

Fleet had no right to cure, even if Burke properly revoked acceptance, because there is no right

to cure in a revocation case. Under that interpretation, if Burke had properly revoked acceptance,

the court would have awarded it the full purchase price regardless of Fleet's attempts to cure. On

the other hand, defendant argues that this language means that Fleet had no right to cure, but

only because Burke never notified Fleet; if Burke had made proper revocation of acceptance,

Fleet would have had a right to cure.

Defendant cites two additional cases in support its position that Kansas affords sellers a

right to cure even where the buyer properly revokes acceptance. First, defendant cites <u>Hemmert</u>,

which states that "one purpose behind the notice provisions is to allow the seller the chance to

cure." 663 F.Supp. at 1551. While <u>Hemmert</u> is a revocation-of-acceptance case, this language is

dicta because the seller in <u>Hemmert</u> did not attempt to cure the defects upon which plaintiff

based his revocation claim.

Second, defendant cites <u>Newmaster v. Southwest Equipment, Inc.</u>, 646 P.2d 488 (Kan.

1982). In <u>Newmaster</u>, the buyer purchased a tiller for his farm that did not work. The buyer

asked the seller to repair it, but despite numerous assurances that he would, the seller failed to do

so. Defendant argues that language in <u>Newmaster</u> implies that there is a right to cure when a

buyer revokes acceptance. However, while the buyer in <u>Newmaster</u> offered to let the seller cure

the defect, the Kansas Supreme Court did not address whether K.S.A. § 84-2-508 <u>requires</u> a

buyer to do so.

The Court concludes that none of the Kansas cases have squarely addressed the issue of a

proper revocation of acceptance and its impact on a right to cure. Nonetheless, commentators

have uniformly cited <u>Fleet</u> and <u>Linscott</u> as standing for the proposition that there is no right to

cure in a revocation of acceptance case. <u>See, e.g.</u>, K.S.A. § 84-2-508 cmt. 3; 2 <u>Hawkland's</u>

<u>Uniform Commercial Code Series</u> § 2-508:1 (2011); 3 Lary Lawrence, <u>Lawrence's Anderson on</u>

<u>the Uniform Commercial Code</u> § 2-508:6 (2011); Howard Foss, <u>The Seller's Right to Cure When</u>

<u>the Buyer Revokes Acceptance: Erase the Line in the Sand</u>, 16 S. Ill. U. L.J. 1, 3 nn.7, 9 (1991)

(citing <u>Fleet</u> as "[holding] or indicat[ing] that the seller's right to cure under U.C.C. § 2-508 does

not arise upon the buyer's revocation of acceptance under U.C.C. § 2-608(1)(b)," and citing

<u>Hemmert</u> as being inconclusive on the matter);  John A. Sebert, Jr., <u>Rejection, Revocation, and</u>

<u>Cure Under Article 2 of the Uniform Commercial Code: Some Modest Proposals</u>, 84 Nw. U. L.

Rev. 375, 391 (1990) (citing, inter alia, <u>Fleet</u> and stating that "a majority of courts, and some

writers, . . . conclude that a seller has no right to cure when the buyer attempts to revoke").

The Court notes that proposed amendments to the UCC eliminate the discrepancy in the

seller's right to cure between rejection of delivery and revocation of acceptance cases by

amending section 2-508 to allow sellers to cure when buyers revoke acceptance as well as when

buyers reject delivery with respect to non–consumer contracts. U.C.C. § 2-508 (proposed

amendments 2002), <u>available at</u> http://www.law.upenn.edu/bll/archives/ulc/ucc2/

22

annual2002.htm. As amended, U.C.C. § 2-508 stands in stark contrast to K.S.A. § 84-2-508, which affords sellers a right to cure only when the buyer rejects delivery.

Defendant asks the Court to read into K.S.A. § 84-2-508 a right to cure in revocation of acceptance cases on the ground that there is no distinction between revocation of acceptance and rejection of delivery, and thus no reason to allow a right to cure in rejection of delivery cases but not in revocation of acceptance cases. This argument is undercut by the proposed amendment to section 2-508, which does not allow a seller to cure if the buyer in a "consumer contract" justifiably revokes acceptance. U.C.C. § 2-508 (proposed amendments 2002), available at http://www.law.upenn.edu/bll/archives/ulc/ucc2/annual2002.htm. There are several differences between revocation of acceptance and rejection of delivery which might explain why U.C.C. § 2-508 applies only to rejection of delivery—the fact that there is a time lapse between acceptance and revocation of acceptance but no lapse in time between delivery and rejection of delivery, and the fact that buyers are entitled to reject delivery of goods for any nonconformity while they may revoke acceptance only if the nonconformity substantially impairs the value of the goods, lessening the need to protect sellers from buyers' revoking acceptance in bad faith. The Court need not speculate as to the actual reason for the distinction, however, because the differences between revocation of acceptance and rejection of delivery provide another basis for the Court's decision not to ignore the plain text of the Kansas statute as argued by defendant. Thus, following the plain text of K.S.A. § 84-2-508, the Court concludes that defendant had no right to

cure in this case because a seller only has a right to cure when the buyer rejects delivery, and that was not done in this case.[5]

### 3.      Plaintiff May Revoke Despite Lacking Title to the Aircraft

Defendant argues in its Second Motion for Summary Judgment that "because the Aircraft's title is encumbered and because a third party currently has repossessed the [A]ircraft, revocation of acceptance is unavailable as a remedy in this case." (Def. Hawker Beechcraft Corp.'s Mem. Law Supp. Second Mot. Summ. J. 21.) Because a buyer need not retain title to the goods in order to revoke acceptance under K.S.A. § 84-2-608, the Court finds that revocation is available as a remedy in this case, even though Webster foreclosed on the Aircraft.

K.S.A. § 84-2-711 provides the remedy for a buyer who justifiably revokes acceptance. That provision states that a buyer may "cancel" the contract and recover "so much of the price as has been paid." K.S.A. § 84-2-711(1). Further, subsection 2-711(3) states that upon "justifiable revocation of acceptance a buyer has a security interest in goods in his possession or control for any payments made on their price and any expenses reasonably incurred in their inspection, receipt, transportation, care and custody and may hold such goods and resell them in like manner as an aggrieved seller." K.S.A. § 84-2-711(3). As one court has put it: "There is no requirement under the provisions of the UCC that on revocation of acceptance a buyer must deliver title to the

---

[5] Defendant also points to K.S.A. § 84-2-608(3), which states that "[a] buyer who so revokes has the same rights and duties with regard to the goods involved as if he had rejected them." Defendant argues that one of those "duties" is offering the seller a right to cure. However, this general provision is not sufficient to overcome the specific text of K.S.A. § 84-2-508, which clearly limits the right to cure to situations in which the buyer rejects delivery.

goods to the seller." <u>Jackson v. Rocky Mountain Datsun, Inc.</u>, 693 P.2d 391, 395 (Colo. App. 1984).

The purpose of revocation is not to place <u>both</u> parties in the positions they were in at the outset. Rather, "[u]nder proper rejection or revocation of acceptance, the buyer is freed from his obligation to pay the purchase price. A buyer has a right to recover that portion of the purchase price already paid when rejection or revocation of acceptance is proper." <u>Johnson v. Gen. Motors Corp.</u>, 668 P.2d 139, 142 (Kan. 1983). In other words, the goal of the doctrine of revocation of acceptance is merely to place the <u>buyer</u> in his or her original position. <u>See, e.g.</u> <u>id.</u> at 145 ("The purpose of allowing revocation after acceptance is to restore the <u>buyer</u> to the economic position the <u>buyer</u> would have been in if the goods were never delivered." (emphasis added)); <u>Evans v. Graham Ford, Inc.</u>, 442 N.E.2d 777, 782 (Ohio 1981) (holding under similar facts that revocation of acceptance was available to buyer). Subsection 2-711(3) supports this understanding of revocation of acceptance; it gives the buyer a security interest in the goods subject to the revocation and allows the buyer to resell the goods to mitigate damages. K.S.A. § 84-2-711(3). A requirement that the buyer give the seller title to the goods upon revocation of acceptance would not comport with subsection 2-711(3).

Many courts have faced circumstances similar to those in the instant case, in which a third party that financed the purchase of the goods foreclosed on the goods before the buyer properly revoked.[6] These courts typically allow the revocation and award damages to restore the buyer to the buyer's original position. <u>See, e.g.</u> <u>Cooper v. Bluff City Mobile Home Sales, Inc.</u>, 78

---

[6] These courts were all interpreting identical versions of U.C.C. § 2-711.

S.W.3d 157, 166 (Mo. 2002); U.S. Roofing, Inc. v. Credit Alliance Corp., 228 Cal. App. 3d

1431, 1454 (1991); Jackson, 693 P.2d at 395; Evans, 442 N.E.2d at 782. In these cases, the buyer

received damages based upon: (1) the amount of the purchase price that the buyer itself paid to

the seller, (2) the amount that the buyer has paid and will be required to pay to the financing

company, and (3) interest. Cooper, 78 S.W.3d at 166; U.S. Roofing, 228 Cal. App. 3d at 1454;

Evans, 442 N.E.2d at 782; Melms v. Mitchell, 512 P.2d 1336, 1343 (Or. 1973) (holding that

buyer is entitled to interest). To complete the revocation, "all that is required is that the buyer

assign to the seller all of his interest in the goods." Jackson, 693 P.2d at 395 (citing Evans, 442

N.E.2d 777).

 Defendant cites Moeller Manufacturing for the proposition that revocation is only proper

if the buyer had unencumbered title to the goods. See Moeller Mfg., Inc. v. Mattis, 519 P.2d

1218, 1220 (Colo. App. 1974) ("[W]e agree with seller that recovery of damages on the basis of

revocation of acceptance should not be available to buyer because title to the [goods] is

encumbered."). However, that decision is grounded on the court's interest in ensuring "that the

seller may regain possession of the goods in order to resell the same and minimize his loss." Id.

That issue is not present in this case; plaintiff's debt to Webster, and thus defendant's liability to

plaintiff, will be reduced by the value of the Aircraft at the appropriate time.[7] Further, most cases

citing Moeller do so where a buyer wrongfully retains goods for his or her personal use, not

where a third party has foreclosed on the goods. See, e.g., Stroh v. Am. Recreation & Mobile

Home Corp. of Colorado, 530 P.2d 989, 993 (Colo. App. 1975) ("[P]laintiffs' remedies under

---

[7] The parties did not discuss this issue in their motion papers, and thus the Court will not address it.

[UCC § 2-711] do not include the right to beneficial use of the [goods].").

### E.     Rescission

Plaintiff also requests rescission of the contract, arguing that it is void due to mutual mistake. There is no need to decide whether the doctrine of mutual mistake applies in this case, however, because rescission is not available as a remedy.

As the Kansas Supreme Court has stated, "[r]escission of a contract is the annulling or abrogation or unmaking of the contract and the placing of the parties to it in status quo." <u>Dreiling v. Home State Life Ins. Co.</u>, 515 P.2d 757, 766 (Kan. 1973); <u>see also</u> <u>Ramada Franchise Sys., Inc. v. Tresprop Ltd.</u>, No. 98-2511, 2000 WL 290349, at *12 (D. Kan. Mar. 10, 2000) (quoting <u>Dreiling</u>); <u>Tow Jack Prod., Inc. v. Johnson Indus., Inc.</u>, No. 90-2392, 1992 WL 170793, at *8 (D. Kan. June 1, 1992) (same); <u>Garrison v. Berryman</u>, 594 P.2d 159, 161 (Kan. 1979) (same). Thus, as opposed to revocation of acceptance, which seeks only to place the buyer in his or her original position, the "general rule [of rescission] is that one who seeks to rescind a contract . . . must place the other party in substantially the same condition he was in when the contract was executed." <u>Dreiling</u>, 515 P.2d at 766.

However, "there are a number of exceptions to this rule." <u>Id.</u> It "does not require, in all cases, that an absolute and literal restoration of the parties to their former condition shall be had," <u>id.</u> at 767. The <u>Dreiling</u> court cited a Maryland case listing seven exceptions to the status quo rule but did not clearly adopt that language or rely on any of the enumerated exceptions. <u>Id.</u> (citing <u>Funger v. Mayor of Somerset</u>, 223 A.2d 168, 174 (Md. 1966)). Rather, the <u>Dreiling</u> court stated that restoration of the parties to the status quo should "be made as is reasonably possible,

and such as the merits of the case demand." <u>Id.</u> Thus, a court deciding whether to make an exception to the status quo rule should do so based on the unique facts of the case. <u>See</u> <u>Whiteley v. O'Dell</u>, 548 P.2d 798, 802 (Kan. 1976) (finding, in a similar situation, that it is within the "inherent equitable power of the court to grant relief which would achieve justice and equity").

In <u>Dreiling</u>, the court held that the status quo rule did not apply because one party to the contract had behaved wrongly. <u>See</u> <u>id.</u> at 768 ("Moreover, if defendant's position should be sustained the result would be that it would in fact, profit by its own fraud."). <u>Dreiling</u> also cited <u>State ex rel. Bradford v. Cross</u>, 17 P. 190, 192 (Kan. 1888), a case in which the court decided the status quo rule did not apply "for public policy reasons" because the contract was based on bribery. <u>Dreiling</u>, 515 P.2d at 767.

In the instant case, rescission of the contract would not place the parties in their original positions. Webster now owns the Aircraft, so defendant cannot retake unencumbered title to it. Further, plaintiff used the Aircraft for two years prior to discovering the cracks and thus has received a benefit that cannot be returned to defendant. Similarly, defendant has lost the opportunity to use the plane and derive benefit from it during those two years. Neither party behaved wrongly in this case, and the Court finds no public policy reason for making an exception to the status quo rule. Thus, the Court concludes that rescission is not available in this case because the parties cannot be returned to their original positions.

## V.   CONCLUSION

For all the foregoing reasons, the Court grants in part and denies in part defendant's Second Motion for Partial Summary Judgment. Specifically, the Court grants defendant's motion

with respect to plaintiff's rescission claim and denies the motion in all other respects. The Court grants in part and denies in part plaintiff's Motion for Partial Summary Judgment. Specifically, the Court grants plaintiff's motion with respect to the breach of express warranty claim and denies it with respect to rescission and the breach of implied warranty claim. A jury trial is required to determine whether the proper remedy for breach of express warranty lies in K.S.A. § 84-2-711 (for revocation of acceptance) or K.S.A. § 84-2-714 (for goods that the buyer has properly accepted). A jury trial is also required to determine damages under whichever remedy is appropriate.